The District Court, the Magistrate Judge here, made not one but three claim construction errors by reading into the claims hardware limitations that do not exist. If the Court wishes to follow along, I direct our attention to page two of the reply brief where we have a claim chart. On the left, excerpts from one of the representative claims with underlined terms at issue, and on the right, the District Judge's construction. I will begin with the microcontroller limitation. The District Judge read the claims to cover only microcontrollers. But as you can see, the programmable device claims, or none of the asserted claims at issue here, have the term microcontroller in them. In fact, they use more general terms, programmable device, processor, and memory. The microcontroller under this patent is limited to a single chip. The microcontroller that's discussed in the patent can function as a single chip. Well, that doesn't count two of the patent defined microcontrollers being limited to a single chip. No, you're right. It does not. It suggests that in contrast to a microprocessor, a microcontroller includes a central processing unit, memory, and other functional elements, all on a single semi-conjector. Right, so a microcontroller has basically a processor, some memory, some I.O. It says all on a single chip, right? Yes, but it doesn't mean it can't access other devices. In fact, it says, if you keep reading down at line 35, column 2, due to the small number of external components required, there are external components that can be accessed by a microcontroller. But as I said, the first error here was he read the word programmable device to mean microcontroller, where that does not even exist, and it does exist in other non-asserted claims. So for example, if you were to look at the 485 patent, there are dozens of claims with the word microcontroller in the preamble of the claim, for example, at page 142. The asserted claims don't have the word microcontroller in it. The specification, Your Honor, column 4, says the processor may be a microcontroller, doesn't have to be, and even the examiner, in issuing a double patenting rejection, not same invention but obviousness type, said that the microcontroller claims, said that the programmable device claims were a broader recitation of the microcontroller claims in the 317. So Mr. Whalen, do I understand your position is that in order to provide the breadth that would be needed for these claims, we ignore, let's assume that there is a prosecution history that might provide a certain estoppel, that's to be ignored if it's not included in the claims? No, I don't think it is in the claims, I don't think it's in the spec, and I don't think it's in the prosecution history. The examiner himself said that the programmable device claims were a broader recitation of microcontroller claims. That would be the opposite of an estoppel. As to what the district judge did next, he then interpreted the word microcontroller to be a very, very, very narrow device that could not access off-chip memory. And again, the claims just use the word memory. They don't say where the memory is, they don't use the term program memory, they're using generic terms because this is a software invention, it's not a hardware invention. Neely, the CEO of Sun Micro, gives us this graphic golf in a telephone booth notion. Why isn't that a disavowal? They're saying golf in a telephone booth, we're not that. Well, what happened here was Java was working on, it was 1996, and Java could work on a desktop computer. Golf is, Java is the golf, right? Java would mean you need a golf course to play golf, because it needs a large virtual memory in the megabyte range, and it needs lots of code. What the invention was here, if you look at column 7 through 18, they made the virtual memory smaller so it fits in the phone booth, and then they made the code different so it works on the new virtual machine. So you have these two combinations of a software invention, which is what they did so it would work on a microcontroller. Microcontrollers only have kilobytes of memory, they don't have gigabytes. But the whole point here is to make it small so it fits on a single chip, no? That's right. If in fact it's broad, and it can include a microprocessor that can access memory in other places, that would clearly be within the prior art, right? So I think what was in the prior art, your honor, I understand your trouble, was microprocessors running big Java. What they did at the time was said, well, what are the other types of computers, and there are these embedded computers that are smaller. And they cannot access chips, but they still have limitations. They figured out a different virtual machine and then a different set of code to run on those smaller devices. Those devices can have chips that they access off-chip, just like the AMD and the Motorola patents show. We cited our blue brief at 13, five or six different references that show that microcontrollers of course can access off-chip. Now they're still going to be limited. Fast forward to today, and we just have a different type of embedded device. They're packed into a phone, they're limited, and they're using the converted Java virtual machine and the converted code just on a new embedded device. They are not using the big Java on these devices. It would be like the analogy of taking something really big, let's say a six by six by six in a truck, but then you wanted to convert it down smaller, and you could then put it in a van. Well, you could put it in a lot of other things. You could put it back in the truck. It would save space. It doesn't mean that you have not taught the new virtual machine, which is much smaller, and then the new device that it would operate on. And just as an example, the two patents, there's not a shred of evidence in the record of a microcontroller that can't access off-chip. So, judges, it is true a microcontroller can run on its own chip, but it's still limited, and it may want to go off-chip to access programs in additional memory right next to it. So for example, the AMD patent at page 425 says, a microcontroller is typically coupled to one or more external memory devices that store software programs, and the Motorola patent says the same thing. The district judge here understood that you could access off-chip, but then he drew the arbitrary distinction that you can only access off-chip for data, but not for programs. And again, the claim doesn't say that, it says memory. If you look at the claim, it wants the program to be working with the interpreter. It's actually doing it. It's operating on the program. It's working. Where it's stored before it's loaded is irrelevant. It's irrelevant to the invention here. It's irrelevant to the inventors here. The district judge made a third error, and he said that when you store that program, when you power down, it has to be in permanent memory. Well, permanent isn't even a term of art. They would have used non-volatile. They didn't. And there are other claims. Again, the 727 patent uses non-volatile. When it wants to use non-volatile, it didn't do so here. And the specification talks about non-volatile and volatile memory, and the claim doesn't limit it. So what this invention was, was taking Java that could work on a microprocessor with huge amounts of memory, card after card and hard disk, and it would not work on the other type of device. It would not work on a smaller device. So they made a different virtual memory that got a lot smaller, they made a different code, and they got a lot smaller. What they're doing now is the same thing. We have our desktops today, and then we have embedded devices. The desktops use regular Java. There's no reason not to. The embedded devices use this converted Java on a new virtual machine. There are pluses and minuses to doing that, but the embedded devices today still have limitations on the amount of memory they have, and speed, and things like that. Why do you say a programmable device and a microcontroller are different? I think the statement, the question is answered by itself. Programmable device doesn't have to be just a microcontroller. It could be different types of devices that are programmed. And what they wanted here was the new virtual machine, which is a different kind of a computer within a computer, running new code. They wouldn't know every single device that was going to be developed 10 years later. They used general terms like programmable device. They also used IC cards. They also used microcontrollers, but they didn't stop at microcontroller. But in column 18, there are other devices here, programmable devices that are referred to, but they're all described as having a microcontroller, right? Well, they do, but they don't use the focusing on microcontrollers, doesn't it? No, I think what they were doing at the time was, Your Honor, the word programmable device doesn't appear in this specification. And so if you look at column five, for example, the upper left corner, they talk about an aspect of the invention is an integrated circuit card in the first paragraph. Don't mention the word microcontroller. The second paragraph, invention features smart card. Don't talk about microcontroller. And then the third device is a microcontroller. So Judge Mike, it is true that this patent would work with a microcontroller, but it's not true that it will only work with a microcontroller that stores the program memory off chip when you power it down. So something that's capable of working on something doesn't mean that's the only thing it would ever work on, especially in the day of electronics where things will evolve. So take an example, it said memory. Let's assume it said nonvolatile memory. And let's assume they described ROM and they were just storing in ROM. But then five years later, you have disks. And five years after that, you have flash memory. If they used memory and if the invention works on all the other types of memory, it's just irrelevant when you store it. The claims are broad enough. It's a classic example of covering memory of that type, nonvolatile memory of that type. That's what we have here. We have devices, which are really not the invention, that run this smaller, much more efficient type of program the way it does. The current accused devices are not your desktop computer. They are just embedded devices that have limitations, just like the embedded devices had limitations in 96. Everything has moved, granted, but it's relative that your desktop is much more powerful and much faster than the embedded devices and has more memory. They are still using this invention. They're not running a naked Java, big Java programs on the embedded devices. They don't want to, it takes too much space, it would flood up the system, it would take a lot of time. They want to use the invention, which is this software technique of a new virtual machine with converted code. They're running on a programmable device, just like the claims say. Mr. Whalen, the defendants say that even if this were construed to include microprocessors, the system is not in use. Did you get that far in the district court? No, Your Honor. I think that what happened here was the claim construction went down a path, and it got narrowed to, everything got narrowed to microcontrollers, then everything got narrowed to all the program memory has to be on chip, and then it has to be permanent. There was no sort of discussion back and forth about, okay, under a correct claim construction, it's not limited to microcontrollers, or that microcontrollers can access off-chip memory, which the patents say, which the evidence says, there was no then discussion about would there be infringement in that case, and that's what the next step would be, if there's a proper claim construction to remand it back and decide, are they practicing the claim convention? The court has no further questions? Thank you. Mr. Whalen? Mr. Perlson? Would you give Mr. Perlson an extra two minutes, and then we'll restore Mr. Whalen's full rebuttal time. Thank you, Your Honor. May it please the court, Your Honor, this, the invention actually at issue here is well put in the title of every one of these patents. Using a high-level programming language with a microcontroller. And the distinction that- Where do the claims mention all programmable memory, all programmed memory? The words all programmed memory do not appear in the claim, obviously that's part of the court's construction. What the court really was- How do you get that into the claim construction then, particularly in light of the differentiation between Claim 1 and Claim 4, where Claim 4 has a portion of the memory in the processor? Sure. Well, I'll deal with the first part first, and then Claim 4 second. First, the reason why the all programmed memory makes sense in the construction really boils down to the dispute that the court was seeking to resolve. Here, our devices, there's no dispute, use microprocessors. And the specification talks about that these microprocessors had access to external memory and that the microcontrollers at issue here were limited in terms of all types of memory that were to be on the microcontroller. They were all on the semiconductor substrate. If you look at in Column 2, I'm sorry, Line 14, it says, the amount of each kind of memory available is constrained by the amount of space on the integrated circuit card used  Column? This is Column 2, I'm in the 317, Column 2, Line 13. 13, Column 2, 13, read-only memory, sorry, generally three types of memory used. It's the next sentence after that. In a micro... Line 14. Okay, in a microcontroller, the amount of each kind of memory available is constrained. And then in the previous... Is that a clear disavowal? Well, there's nothing being disavowed. It's defining. An unmistakable disavowal? Well, the claim doesn't cover it, doesn't contain the all-program memory limitation that you're suggesting it must. We have a clear indication from Claim 4 that it's not supposed to be limited to all-program memory, so about the only thing you can show us is that they have clearly and unmistakably disavowed anything except what you purport is the invention. Well, first of all, the Claim 4, all Claim 4 says is that a portion of the memory is located in the processor. And maybe, as what the spec says, the spec says in Column 4, a portion of the memory may be located in the processor. Right. And all that is saying is that... And then if you go back to Claim 1, it refers to... Meaning that it doesn't have to be all, right? No, but we're not saying... The processor that is being referred to there is the CPU. It's the CPU that's on the microcontroller. If you look earlier in the specification, it talks about how in Column 2, Line 2, it says, in contrast to the microprocessor, a microcontroller includes a central processing chip... I'm sorry, a central processing unit, memory, and other functional elements all on a single semiconductor substrate or integrated circuit. The memory that is being referred to in that claim is the memory that could be on the central processing unit. That's the cache memory that plaintiff is trying... Later on, tried to, after the court made the all-program memory construction, they tried to read the cache memory, which is this very small, temporary memory that is used to help the execution of the CPU, and it's on the CPU. And so that's what that Claim 4 is talking about. It does not say at all that the microcontroller may contain memory. It does not... It says the processor, and the processor is what is referred to in the claim. I mean, it says an integrated circuit card for use with the terminal, this Claim 1 comprising, and then... Claim 4, yes. And then it talks about... Nothing about being a cache. It says the integrated circuit card of Claim 1, wherein a portion of the memory is located. A portion. Yes. Absolutely. Meaning that Claim 1, which also doesn't mention the cache, can have less than all. No. Well, all it's saying... First of all, the memory, there's no... If you look at the claim, first of all, it requires an integrated circuit card. So there's no dispute that that's a limitation. It has... So first, we have to decide what an integrated circuit card is. And the integrated circuit card is a microcontroller... It is a card that has this microcontroller. Plaintiff seems to have backed away from that now, but earlier on in the case, they said explicitly that the integrated circuit card is a narrow set, and is narrower than microcontroller, and includes these claims that have a microcontroller and a card. So what we look to then is to see what is on this integrated circuit card. And the claim, it has a communicator, and it has a memory. I'm getting off track again. The claim construction has read in a requirement that it be all programmable memory. Where does that come from? How can that be justified in light of a specification that says it may be a portion? A alternative claim that says it may be a portion? And nothing in the claim language itself that says it has to be all programmable memory. Please help me out here. It's the definition of what a microcontroller is. The patent talks about how it has the memory, the processor, all on a single chip. And when it's referring, and back to what I read you before, earlier in the specification in column two, line 11, it refers to these three types of memory, RAM, ROM, and EEP ROM. And the memory that we're talking about here is the memory that's required to run the application. The whole point of this thing is to run Java, these Java programs, on the microcontroller. And the distinction that was being raised both in the specification and in the prosecution history is that the microprocessor systems had access to this external memory to run these programs. If you allow a microcontroller to access this external memory to run the programs, you take away the entire problem that the patent was coming to solve. And all that is referring to, that claim four, all that it is referring to is that a portion of the memory that is referred to in claim one, which is a memory storing, and then it has an application, and then it says what this application does. All it means is that a portion of that memory can be on the processor, the CPU that's on the single semiconductor substrate. It does nothing to say that it can be off-chip because the patent is very clear that the memory has to be on-chip in a microcontroller. So, it's just all that it's talking about is saying in claim one, the memory that is the processor and the memory. And it's very clear in the patent that we're talking about all three types of these memories and that the memory that we're talking about is the program memory, the memory to run the Java program. And what the court found correctly is that when, as compared, what the patentees were saying is that as compared to these... You're trying to say the reason we should ignore the specification and the alternative claims is because you view the problem to be solved by this invention as X. And so, in order to get to your narrow claim construction, we have to agree with you that the only problem being solved is the narrow one of working off of micro... Working in the way you say it's supposed to work. Well, I'll say that two ways. First of all, it's not agreeing with me. I mean, the patent says again and again that this is the problem that it's solving. It's putting Java on the smart card. You mentioned several examples, but those are examples and not binding and they haven't disavowed. At least I haven't heard you say they've clearly and unmistakably disavowed subject matter here. There's nothing to disavow. They defined it. They defined it in here. That's what a microcontroller is. Give me that definition, if you would. Well, they say that, just like I said, one of the places where they say in contrast to the microprocessor, a microcontroller includes a central processing unit, memory, and other functional elements all on a single semiconductor substrate or integrated circuit, a chip. The memory that we're talking about is referred to right below. It refers to the RAM, the ROM, and the EEP ROM, and it says in the microcontroller, the amount of each kind of memory available is constrained by the amount of space on the integrated circuit card for each type of memory. When we're talking about the memory that we're talking about here is the memory to run these programs, to run these Java programs. It's the explicit distinction between the microprocessors which did not have to have all of this on this tiny chip. They could access all the RAM they wanted. They could access all the ROM they wanted in these microprocessor systems that indisputably ran Java before, and so they defined it in this way because that's what microcontrollers are, and it was the way that they were able to distinguish the prior art. For example, in the prosecution history, this golf in a phone booth, the prior art that they were trying to distinguish... But that's an analogy. That's not a definition. And by the way, they don't tell you what the telephone booth is. It's not a concession. Well, the golf in a phone booth, they do tell you. It says explicitly that they were referring to putting Java on a smart card. The smart card is the phone booth. Basically, what they want to now try to say is that their patent applies to even desktop computers, the same desktop computers that ran Java before. They want to say that there's no limitations. These memory limitations are gone, that there's no limitations for it to be on chip, even though the patents explicitly say that it's on chip. And as to the Claim 4 point, again, I don't think that we're telling you to ignore that at all. Our construction is absolutely perfectly consistent with what it says. But because the construction requires that the amount of each kind of memory available is on the chip, and the processor, the CPU, is on the chip. So it's perfectly consistent with our construction to say that a portion of that memory may only also be on the processor. Claim 4 in no way is saying that a portion of the memory may be on a microcontroller. That's not what it says at all. It says the processor. And the processor is a CPU. And so that's what Claim 4 is talking about. We raised this, and I don't think we've ever heard a real rebuttal to this issue. We raised it below. We raised it here. And I don't think that there's any real rebuttal to that. There's nowhere that would suggest at all that when the specification is talking about the process that a portion of the memory may be on the processor, that what they're really talking about there is the microcontroller. It's common parlance that a CPU is the central processing unit. That is the processor that they're talking about there. And our construction is absolutely consistent with that. To what extent does your argument take into account that technology progresses and that an invention which is directed towards 1990s technology can be used in 2010 technology? Sure. Understood. And I think that the easiest way to say that is that the defendants are using the technology that nobody disputes existed before. We're using microprocessors. We're using microprocessors that access off-chip memory, and that's no different than the desktop systems that use microprocessors to access off-chip memory. And so, yeah, it could advance, but the prior art was already at the point of the microprocessor systems that we're using in our systems. So it can advance, but we're using microprocessors, and the patents talk about microcontrollers. Talk about smart cards, but doesn't smart cards cover a lot of different embodiments, including just programmable devices, which is a lot broader than microcontrollers. Well, none of the claims refer to smart cards. There's two claims, the integrated circuit cards. But the spec does. The spec does. The spec does, sure, but I think it also basically refers to smart card interchangeably with an integrated circuit card, which also was commonly known. I don't think that that's legitimately disputed, that a smart card is used interchangeably with an integrated circuit card. They're basically the same thing. There was a set of basically specification. It was a universal specification that was adopted for integrated circuit cards and smart cards, and that they were these cards that had these microcontrollers on them. I do want to address the programmable device point. I mean, there's no dispute here that programmable device does not have a plain and ordinary meaning. The court found it below. Plaintiff, in its reply, agrees with that. And yet, the only programmable device that is referred to in the specification at all is a microcontroller. There's nothing else in the specification that is programmed as part of this invention other than the microcontroller. And if you read in column 18, line 31, it refers to, in other embodiments, the above described techniques are used with the microcontroller. And then a few down, it says, most existing devices and new designs that utilize a microcontroller could use this invention to provide the ability to program the microcontroller using a high level language. Because there's no plain and ordinary meaning of programmable device, we have to go to the specification. This is the only place in the specification that talks about programming a device and it's this microcontroller. And that's how the court found it. And really, the court did that ultimately in a way because that was the central dispute here. Can they read their patent on our microprocessor systems, our microprocessor-based systems that they explicitly distinguished and defined against in the prosecution history and in the specification? Let's see, my time is up. Mr. Olson? Wayland, you have your rebuttal time? Thank you, Your Honor. Just a few points. Mr. Wayland, in claim four, do you agree that the reference to processor is for the CPU?  No. How is it that processor doesn't refer to the CPU? Well, what they're saying is that claim one has a processor and a memory. And claim four says a portion of the memory is located in the processor. So that means some memory is in the processor. The CPU. Yes, I think that is another definition for it. But it doesn't say where the rest of the memory is. It doesn't say whether the rest of the memory is still on the chip. It doesn't say whether the rest of the memory is on a different chip. So claim four is not necessarily inconsistent with the district court's construction. It is, Your Honor. How is that true if the word processor means CPU? So it says that a CPU will have some memory on the same chip. But it doesn't only access that memory. As we've shown you with patents and data sheets, these devices can access additional memory. If you look at figure 25, which has the circuit board, what we're saying here is you have a device. And then can you have a chip next to it that has some additional memory? That's all we're saying. It doesn't mean it turns into a desktop computer, but it is still embedded. It is able to access off-chip memory. For it to run, it has to run on the chip because it has to be loaded. This is just where these programs are stored. And so the way they wrote the claims is you load the interpreter. You load the program. It doesn't make a difference where you load it from. And it runs. And that's exactly what they said here. I do dispute that the accused devices are simply running processors like are on desktops. In fact, at page 262, there's evidence by their own witnesses that says the current embedded processors are much slower, have much less memory than modern day desktops. So even a device that I can hold in my hand has limits, just like the smart cards and the IC cards that they talked about then. And they have limits here, and they're doing the same thing. My opponent says all this is about is the hardware it's running on. That's the opposite of the issue. The issue is are they running this converted language, this converted program? They are. And they're running it on an embedded device that at page 725 refers to it as a modern day microcontroller. So what would be a microcontroller today versus then? Everything has moved. The last point I want to make is there seems to be two, for lack of better analogies, two ends of a football field. That you have a Microsoft processor on the one hand with unlimited amounts of memory. And then you have a microcontroller that can run on itself. Well, the inventors here taught how to run Java on the very small device. That does not mean it has to run only on the smallest of devices that doesn't even exist. If you put another chip next to it, it's only kilobit memory. It doesn't have massive amounts of memory. It doesn't equate to a desktop mainframe. But you can have a circuit board just like Figure 25 with additional memory to store some of the additional programs. That's all for now. Thank you, Mr. Whelan.